LYNN H. PASAHOW (CSB NO. 054283)
lpasahow@fenwick.com
J. DAVID HADDEN (CSB NO. 176148)
dhadden@fenwick.com
DARREN E. DONNELLY (CSB NO. 194335)
ddonnelly@fenwick.com
RYAN A. TYZ (CSB NO. 234895)
rtyz@fenwick.com
FENWICK & WEST LLP
Silicon Valley Center
801 California Street
Mountain View, CA 94041
Telephone:    (650) 988-8500
Facsimile:    (650) 938-5200

Attorneys for Defendants
Amazon.com, Inc. and Borders Group, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SBJ IP HOLDINGS 1, LLC,<br><br>Plaintiff,<br><br>v.<br><br>NETFLIX, INC., AMAZON.COM, INC., and BORDERS GROUP, INC.<br><br>Defendants. | Case No.  3:08-mc-80109 SI<br><br>(U.S.D.C. Eastern District of Texas)<br><br>**DECLARATION OF RYAN TYZ IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL NON-PARTY VIGNETTE CORPORATION'S COMPLIANCE WITH SUBPOENA *DUCES TECUM***<br><br>Date:    July 18, 2008<br>Time:    9:00 a.m.<br>Dept.:    Courtroom 10, 19th floor<br>Judge:  The Honorable Susan Illston |

**[REDACTED NON CONFIDENTIAL PUBLIC VERSION]**

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

I, Ryan A. Tyz, hereby declare as follows:

1.      I am an attorney duly licensed to practice in California and an associate at the law firm of Fenwick & West LLP, counsel for Defendants Amazon.Com, Inc. and Borders Group, Inc. (collectively "Defendants") in this matter.  I have personal knowledge of the matters set forth herein, and if called upon to do so, I could and would testify competently thereto.

2.      I hereby certify that I have in good faith attempted to meet and confer with Vignette Corporation's ("Vignette") counsel in an effort to resolve the dispute that is the subject of this motion without court action, as required by Fed. R. Civ. P. 37 and Civil L.R. 37-1(a).

### Vignette's Relationship with Plaintiff and Interest in this Litigation

3.      On April 9, 2007, SBJ Holdings 1, LLC ("SBJ") filed this lawsuit against Defendants alleging infringement of U.S. Patent No. 6,330,592 ("the '592 patent").  Vignette is listed as the assignee of the '592 patent.  A true and correct copy of this patent is attached hereto as **Exhibit 1**.

4.       At a recent status conference in this case, Judge Everingham stated:  "when I consider Vignette, I'm going to consider them as though they were a Plaintiff in the case, given what their relationship is with the current Plaintiff."

### Defendants' Efforts to Obtain Documents from Vignette

5.      On or around May 8, 2008, Defendants served a subpoena from this District to Vignette, with seven requests for information. ("the Subpoena").  A true and correct copy of the Subpoena is attached hereto as **Exhibit 3**.

6.      Through meet and confer efforts, counsel for Vignette, Ms. Sue Ayers, and I resolved six of the seven requests in the Subpoena.  In fact, Vignette agreed to produce documents responsive to many of them.  However, the parties were unable to resolve Request No. 6, which is the subject of Defendants' motion to compel.  A true and correct copy of a May 23,

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1  2008 letter from me to Ms. Ayers memorializing these meet and confer efforts is attached hereto

2  as **Exhibit 4**.  To resolve the dispute regarding Request No. 6, I proposed limiting the request to

3  documents that refer to the personalization, customization, or recommendations functionality of

4  user websites implementing Vignette's StoryServer products.  *Id.*

5       7.      I made Request No 6 formally in the Subpoena in response to Ms. Ayers'

6  statement to during discussions in Mid-April 2008 that certain information I requested during

7  those discussions was not covered by Defendants' previous subpoena issued to Vignette out of

8  the Western District of Texas.  This is confirmed by a letter from Ms. Ayers to me dated May 6,

9  2008:  "In mid-April, in a conversation *regarding new requests that were outside the scope of the*

10  *original subpoena*, you asked if I would accept service of a new subpoena on behalf of Vignette.

11  Presuming that the new subpoena would issue from the Western District of Texas, I agreed."

12  (emphasis added).  A true and correct copy of Ms. Ayers' May 6, 2008 letter is attached hereto as

13  **Exhibit 5**.

14       8.      Indeed, Defendants' only made five requests in its previous subpoena which issued

15  from the Western District of Texas, none of which were drafted to capture the documents sought

16  by Request No. 6.  A true and correct copy of Defendants first subpoena is attached hereto as

17  **Exhibit 6**.

18       9.      As Ms. Ayers' recognized, Defendants' previous subpoena "requested documents

19  relating to the *incorporation of the patented subject matter in StoryServer*, such as design

20  specifications and market requirements documents."  It did not seek documents relating to the

21  implementation of StoryServer in customer websites.  *See* Letter from Ms. Ayers' to me dated

22  February 28, 2008 (emphasis added).  A true and correct copy of Ms. Ayers' February 28, 2008

23  letter is attached hereto as **Exhibit 7**.

24       10.     Based on my conversations with Ms. Ayers and others in the industry familiar with

25  Vignette's StoryServer product, I understand that in many instances StoryServer is not simply

26  purchased "off-the-shelf" by website providers, but rather implemented, and sometimes

27  specifically modified for use, in particular websites with the assistance of Vignette's technical

28  support staff.  Various documents downloaded from Vignette's website describe "Vignette

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

TYZ DECLARATION ISO OF
MOTION TO COMPEL VIGNETTE                3        CASE NO. 3:08-mc-80109 SI

1  Support Services."  True and correct copies of these Vignette documents are attached hereto as

2  **Exhibit 8**.

3      I declare under penalty of perjury that the foregoing statements are true and correct, and

4  that I executed this declaration on June 13, 2008 in Mountain View, California.

5                       FENWICK & WEST LLP

6

7                       By: */s/ Ryan Tyz*

8                               Ryan Tyz

9                       LYNN H. PASAHOW (CSB NO. 054283)
                        lpasahow@fenwick.com

10                       J. DAVID HADDEN (CSB NO. 176148)
                         dhadden@fenwick.com

11                       DARREN E. DONNELLY (CSB NO.
                         194335)

12                       ddonnelly@fenwick.com
                         RYAN TYZ (CSB NO. 234895)

13                       rtyz@fenwick.com

14                       FENWICK & WEST LLP
                         Silicon Valley Center

15                       801 California Street
                         Mountain View, CA  94041

16                       Telephone:    (650) 988-8500
                         Facsimile:    (650) 938-5200

17

18                       Attorneys for Defendants
                         Amazon.com, Inc. and Borders Group, Inc.

19

20

21

22

23

24

25

26

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

TYZ DECLARATION ISO OF
MOTION TO COMPEL VIGNETTE
        4        CASE NO. 3:08-mc-80109 SI

# EXHIBIT 1

US006330592B1

(12) **United States Patent**
Makuch et al.

(10) Patent No.: **US 6,330,592 B1**
(45) Date of Patent: **Dec. 11, 2001**

(54) **METHOD, MEMORY, PRODUCT, AND CODE FOR DISPLAYING PRE-CUSTOMIZED CONTENT ASSOCIATED WITH VISITOR DATA**

(75) Inventors: **Michael K. Makuch**, Austin; **Neil Webber**, Round Rock, both of TX (US)

(73) Assignee: **Vignette Corporation**, Austin, TX (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/205,077**

(22) Filed: **Dec. 5, 1998**

(51) Int. Cl.[7] ..................................... G06F 15/16
(52) U.S. Cl. ............... 709/217; 709/203; 711/118; 707/10
(58) Field of Search ...................... 709/224, 223, 709/217; 711/118; 707/10

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,572,643 | * 11/1996 | Judson | 709/218 |
| 5,727,129 | * 3/1998 | Barrett et al. | 706/10 |
| 5,740,430 | 4/1998 | Rosenberg et al. | 395/616 |
| 5,796,952 | * 8/1998 | Davis et al. | 709/224 |
| 5,870,559 | * 2/1999 | Leshem et al. | 709/224 |
| 5,878,223 | * 3/1999 | Becker et al. | 709/223 |
| 5,958,008 | * 9/1999 | Pogrebisky et al. | 709/223 |
| 6,067,565 | * 5/2000 | Horvitz | 709/218 |
| 6,085,226 | * 7/2000 | Horvitz | 709/203 |
| 6,094,662 | * 7/2000 | Hawes | 707/104 |
| 6,112,279 | * 8/2000 | Wang | 711/119 |
| 6,128,655 | * 10/2000 | Fields et al. | 709/219 |
| 6,138,141 | * 10/2000 | DeSimone et al. | 709/203 |
| 6,141,737 | * 10/2000 | Krantz et al. | 711/171 |
| 6,185,586 | * 2/2001 | Judson | 707/513 |
| 6,185,608 | * 2/2001 | Hon et al. | 709/216 |

* cited by examiner

*Primary Examiner*—Krisna Lim
(74) *Attorney, Agent, or Firm*—Gray Care Ware & Freidenrich, LLP

(57) **ABSTRACT**

Visitor interests can be tracked by including "keyword directives" in content contained within the web site. These keyword directives specify a keyword indicating the type of category of information represented by the content. As the content is delivered to the visitor in the form of a web page, the number of keyword directives attached to the content is accumulated into a specified visitor profile. Over time, this visitor profile can represent the types of information the visitor has viewed and serve as an indicator of his or her preferences. In this way, the invention can accumulate a visitor profile unobtrusively, without requiring the visitors to fill out a survey or questionnaire. The profile may also be augmented with explicit information the visitor provides over time, such as a name or address provided when ordering a product from the site. The invention then delivers personalized pages to the visitor by examining such visitor's profile.

**19 Claims, 3 Drawing Sheets**





FIG. 1

FIG. 3

SBJ 00006

200 

*FIG. 2*





*FIG. 4*

US 6,330,592 B1

1

# METHOD, MEMORY, PRODUCT, AND CODE FOR DISPLAYING PRE-CUSTOMIZED CONTENT ASSOCIATED WITH VISITOR DATA

## TECHNICAL FIELD

This invention relates generally to the usage of a computer network by a user as more specifically to the techniques of providing specialized information to a network user based on accumulated user data.

## BACKGROUND

The World Wide Web (WWW) of computers is a large collection of computers operated under a client-server computer network model. In a client-server computer network, a client computer requests information from a server computer. In response to the request, the server computer passes the requested information to the client computer. Server computers are typically operated by large information providers, such as commercial organizations, governmental units, and universities, and are typically referred to as "web sites". Client computers are typically operated by individuals.

To ensure interoperability in a client-server computer network, various protocols are observed. For example, a protocol known as the Hypertext Transport Protocol (HTTP) is used to move hypertext files across the WWW. In addition, the WWW observes several protocols for organizing and presenting information, two examples being the Hypertext Markup Language (HTML) and the Extensible Markup Language (XML). The information delivered by the server computer is typically referred to as a "web page".

A server computer can use a technique known as "dynamically-generated customized pages" to create a web page in response to a request for information from a client computer. A dynamically-generated customized page results in a set of information in a particular format. For example, a first client computer may support the ability to represent information in a number of columns, while a second client computer may support the ability to represent information in a table. Thus, a server computer receiving a request from the first client computer can dynamically generate the requested information in a format with columns. It can respond to a request from the second client computer by dynamically generating the requested information in table format. In this example, two customized pages are created to represent the same information.

It is not unusual for a server computer on the WWW to contain thousands or even tens of thousands of web pages. This large quantity of e makes it difficult for a person, i.e., a "web site visitor", operating a client computer to locate the information of most interest to them. In much the same way that dynamically-generated customized pages can be used to present the same information in a different presentation format for each client computer, dynamically-generated customized pages can be used to select the information to be displayed so that each web site visitor may see information customized to their specific interests. This process is known in the art as personalization.

Personalization can be achieved through current technology using survey questions to ascertain the visitor's interests, and using dynamically-generated customized pages compute customized pages for each visitor. There are two disadvantages to this approach. First, web site visitors frequently prefer to not fill out questionnaires when visiting a web site, making it difficult for a site to gather the

2

necessary visitor preference data. Second, dynamic generation of every page on a server computer does not scale well for large numbers of requests. In other words, existing methods provide a relatively slow response when a large number of requests are made for personalized pages. This slow response time is attributable to the fact that in existing systems a computer program must be executed to completely generate each dynamic page on every single request.

In view of the foregoing, it would be highly desirable to provide a technique to unobtrusively gather web site visitor preference data and efficiently respond to a large number of requests for personalized pages.

## SUMMARY OF THE INVENTION

The invention is a method and apparatus for learning in what a visitor is interested and what demographics the visitor may demonstrate so as to deliver personalized information to the visitor based upon accumulated data, and to do so without requiring dynamic page generation for each individual visitor.

For example, a visitor may demonstrate interest in football and, in particular, his favorite football team. The present invention learns this by observing the behavior of the visitor, i.e., which sports articles he reads and if such articles are focused even further. If a tendency is observed, the learned knowledge is then used to deliver more information about that team to the visitor. Such preferred articles can be recycled by having the invention deliver the same information to other visitors who have the same favorite team.

Visitor interests can be tracked by including "keyword directives" in content contained within the web site. These keyword directives specify a keyword indicating the type of category of information represented by the content. As the content is delivered to the visitor in the form of a web page, the number of keyword directives attached to the content is accumulated into a specified visitor profile. Over time, this visitor profile can represent the types of information the visitor has viewed and serve as an indicator of his or her preferences. In this way, the invention can accumulate a visitor profile unobtrusively, without requiring the visitors to fill out a survey or questionnaire. The profile may also be augmented with explicit information the visitor provides over time, such as a name or address provided when ordering a product from the site.

The present invention then delivers personalized pages to the visitor by examining such visitor's profile. Another directive, called a personalization directive, may be placed into web pages that are to be customized by the invention. These directives cause a personalization function to be applied to the visitor's profile data. The result of the personalization function defines an attribute to be used for locating personalized page fragments, called "page components", that the invention then assembles into a customized page for the visitor. In this manner, each visitor may receive a page containing three different classes of data: common data received by all visitors, personalized data received by a similar group of visitors, and individual data received only by this one visitor. The present invention assembles all of this data and delivers a "personalized" page to the visitor.

The present invention stores personalized page components in a cache. Subsequent delivery of the same page components is satisfied by retrieving the information from the cache, rather than by dynamically generating it each time. The present invention can therefore take advantage of a common situation where large groups of visitors share

SBJ 00009

US 6,330,592 B1

3                                                                      4

similar interests and should receive the same data. Since previously generated personalized page components need not be re-generated for every visitor, computational overhead is reduced tremendously by supplying such pregenerated page components.

For example, a home page for a large web site might include a personalization directive describing the inclusion of an article related to a visitor's favorite NFL team. The personalization directive function examines the visitor profile, determines the favorite team, and includes the appropriate page with information about that team. In this way, each visitor to the web site might receive a different introductory web page, customized for their preferences. Even though every visitor receives a page that appears to be customized for them, since, in fact, there are only 30 or so NFL teams, the caching mechanism of the invention ensures that the dynamic page generation only occurs at most 30 or so times. If one million visitors come to the site, most of the visitors simply receive a web page that was already dynamically generated for a previous visitor. In essence, the invention allows "personalized" pages to be constructed by choosing from a set of previously computed pages, rather than by dynamically computing each page for every visitor.

It is a primary object of the present invention to provide an efficient mechanism for gathering visitor preference and behavior information and storing it in a visitor profile.

Another object of the invention is categorizing content in a web site and associating viewed categorized content with a user to develop a visitor profile.

It is another object of the present invention to provide a highly efficient and scalable mechanism for assembling personalized pages based on information contained in the visitor profile, without requiring a full dynamically-generated customized page computation for each visitor.

It is still another object of the present invention to allow for specific data from the visitor profile to be directly inserted into personalized pages.

Yet another object of the invention is to insert pre-customized content into various areas of a single web page.

It is a further object of the invention to allow for visitor profile data to be based on the actual content viewed by the visitors.

It is another object of the invention to allow for visitor profile data to be gathered and updated efficiently even in the case where multiple web servers are operating simultaneously to deliver information to users in parallel.

It is another object of the invention to provide efficient management and storage of visitor profile data for large web sites that may have as many as 10 million visitors or more.

The above objects of the invention and the brief description of the preferred embodiment should be constructed to be merely illustrative of some of the more prominent features and applications of the invention. Many other beneficial results can be attained by applying the disclosed invention in a different manner or modifying the invention as will be described. Accordingly, other objects and a fuller understanding of the invention may be had by referring to the following Detailed Description of the preferred embodiment.

BRIEF DESCRIPTION OF THE DRAWINGS

For a more complete understanding of the present invention and the advantages thereof, reference should be made to the following Detailed Description taken in connection with the accompanying drawings in which:

FIG. 1 illustrates a client-server computer network that may be operated in accordance with the present invention;

FIG. 2 is an example page delivered by a web server;

FIG. 3 illustrates a relationship diagram of the primary components in the present invention; and

FIG. 4 illustrates the invention configured for use with multiple server computers.

DETAILED DESCRIPTION OF THE INVENTION

FIG. 1 illustrates a client-server computer network 100 that may be operated in accordance with the present invention. For the preferred embodiment, the network 100 includes at least one client computer 110 and at least one server computer 130. The client computer 110 and the server computer 130 are connected by a transmission channel 120, which may be any wire or wireless transmission channel.

The client computer 110 may be a standard computer including a Central Processing Unit (CPU) 112 connected to a memory (primary and/or secondary) 114. The memory 114 stores a number of computer programs, including a "browser" 116. As known in the art, a browser is used to communicate with remote server computers 130 and to visually present the information received from such computers. The client computer 110 establishes network communications through a standard network connection device 118.

The server computer 130 includes standard server computer components, including a network connection device 138, a CPU 132, and a memory (primary and/or secondary) 134. The memory 134 stores a set of computer programs to implement the processing associated with the invention. These programs are collectively referred to as a the web server software 136. The invention may be used with any web server software, including, but not limited to, Netscape Enterprise Server from Netscape Inc., Internet Information Server from Microsoft, or Apache from the Apache HTTP Server Project.

FIG. 2 illustrates a typical web page 200. The web page contains graphical information and textual information. Web page design varies greatly, but usually follows a general pattern of being divided up into sections of related information. In the provided example, there are four areas of information 210, 220, 230, and 240. In the terminology of the invention, each of the distinct sections of the web page, such as 210, 220, 230 and 240, are called 'components'. The component on top 210 contains a company logo graphic 212. Below it is a component 220 containing sports news stories intended to be of interest to the web site visitor. At the bottom 230 is what is called in the art a "navigation bar" containing hyperlinks 232, 234 to other web pages on the site. In the preferred embodiment, a hyperlink is defined by HTML (or any other appropriate markup language) as a point-and-click mechanism implemented on a computer that allows a viewer to link (or jump) from one screen display where a topic is referred to (called the 'hyperlink source') to other screen displays where more information about that topic exists (called the 'hyperlink destination'). A hyperlink thus provides a computer-assisted way for a human user to efficiently jump between various web pages containing related information. Hyperlinks can be graphical 234, stylized text 232, or even plain text 224, conventionally formatted with underlining.

In the example of FIG. 2, the small component 240 on the page illustrates personalized information as provided in the manner of the present invention. The first line 242 shows an

SBJ 00010

US 6,330,592 B1

5

example of 'monogramming', where the generic information on the page has been customized with information specific to a particular web site visitor. The next line 244 shows an example of the results of a personalization directive. The information on the page has been customized to reflect the fact that this visitor, preferably based on prior visits, has demonstrated interest in the Round Rock Rocker's football team; therefore, a custom hyperlink 244 has been added to the page to provide the visitor with a quick way of obtaining more information about their favorite team.

The main story component 220 shows another example of personalization. Visitors interested in football can be shown a set of football stories 221, 223, 225; whereas other visitors may be shown basketball or baseball stories.

This type of personalization can be achieved in the prior art only by forcing the user to explicitly answer survey questions and creating individualized pages. For example, a survey would ask the visitor whether the visitor preferred to see football or baseball stories, and then ask the visitor for their favorite teams in order to obtain profile information. Furthermore, current technology would require that every page on the web site be generated dynamically for each visitor, which results in slow response times and poor performance.

The present invention solves the problem of explicit questions and the performance problem. In the preferred embodiment, the method is implemented on a web site server. When the web site is being developed, "Web Content Items" are created by the developers of the web site. Web Content Items can be an entire web page, a component of a web page, an insertion into a web page, a graphic link and/or any other items that can be accessed and viewed by a user. Often times a content item is a self-contained story or fragment of data; for example, the individual stories 221, 223, 225 are each a Web Content Item. Web Content Items can reside at more than one URL. The Web Content Items are preferably defined through a markup language, including, but not limited to, HTML.

In the preferred embodiment the developer can then assign at least one category and/or a keyword to each of the Web Content Items. These categories and key words are used to determine visitor interest when they access Web Content Items on a Web Site.

In such a preferred embodiment, the developer thereby defines all the categories that can be used within the system. The categories might be broad definitions and/or include keywords. The developer can then devise a set of Web Content Items that can 'personalize' the Web Site for the visitor the next time the visitor accesses the web site. This personalization can be done according to the accumulated data in the visitor's file, gathered implicitly by observing which Web Content Items, and therefore which categories have been of interest to the visitor in the past. The 'personalization' will not be a one-time dynamically generated customized web page, which would be too resource intensive and therefore slow, but will be based on predetermined Web Content Items that are developed and then cached into memory.

The accumulation process functions when a visitor accesses a URL and the associated Web Content Items. At that point the program registers the representative categories belonging to the web page. If this is a new visitor, a new "visitor file" for that visitor is created; otherwise, a previous visitor file is accessed. In either case, the statistics on the accessed categories is updated in the visitor's file.

6

The visitor file contains a Lining tally of the visitor's interest preferably based on accessed Web Contents Items. In a preferred embodiment, an algorithm is included that gives greater weight to more recently accessed Web Content Items, thereby accounting for changing interests and tastes.

When a visitor accesses a web site that has an existing file for that visitor, the program determines from the file and the tallied categories, which pre-customized content, i.e., the personalized page components, to provide to the visitor.

Such predetermined content is cached in memory and is, preferably, designed by a web site to appeal to interests in certain topics.

The benefits of the present invention are immediately evident. The present invention gives the visitor the impression of a customized page visitor when in actuality it presents pre-customized pages and/or page components that have been cached. The system thereby conserves computing resources and retains a higher access speed on a server as opposed to those systems that dynamically generate customized pages for each visitor.

In the alternative embodiment, the pre-customized pages have at least one base Web Content Item and insert areas wherein personalized page components are provided and inserted to make each page appropriate for a given preference. In another alternative embodiment, the entire page can be obtained from the cache.

Returning to FIG. 2, the page is illustrative of how a base page is pre-customized to make it seemingly customized for a given visitor. Assuming that a visitor frequents a sports-oriented web site in the preferred embodiment, the main story on the page could be the same for all the pre-customized pages, for example, a Super Bowl story; however, the additional stories on the page can be adjusted with inserts of personalized page components items according to the visitor's preferences, such as individual team information. Assuming that visitor A in prior visits has frequented a number of Web Content Items with a keyword of "football", then when visitor A returns to the web site a page with personalized page components will appear where the page components (e.g., 221, 223, 225) are Web Content Items comprising football-related stories.

FIG. 3 shows a relationship diagram for the invention. Requests begin when a browser 310 operating on a client computer (as in 110 in FIG. 1) makes a request to the web site server (as in 130 in FIG. 1). When the site is being accessed, the server request handler 320 analyzes the incoming request and the corresponding pages, and invokes the monogrammer 330 and the component assembler 340 as necessary.

The component assembler 340 examines the visitor file, if any, to determine if there is a preference to be associated with the accumulated category and keyword counts of the visitor. The visitor file is obtained from the visitor data manager 350, which serves as a central coordination point for retrievals and updates of visitor data within a single web server. If there is no file for this visitor, the program generates a file based on the visitor so as to determine the visitors reference for the next page requested.

If a visitor file exists for the current visitor, the program accesses such visitor file to determine the visitor's interests as determined by the keywords associated with prior Web Content Items served, and, in one embodiment, there may be a weighing factor or other algorithmic determination for the additional Web Content Items viewed by the visitor during the most recent usage. The program then selects a pre-customized page or pre-customized page components which

SBJ 00011

US 6,330,592 B1

7

should reflect this interest. These selections can be assembled by a component assembler 340, and may be further subject to personal modification by a monogrammer 330 to make changes such as inserting the visitor's name onto the page.

The component assembler uses the pre-customized file handler 360, to retrieve the Web Content Items, formatted as pre-customized pages, that are appropriate for this visitor. Pre-customized pages can be cached in a pre-customized file store 365, or can be dynamically generated on demand by the dynamic page generator 380.

The visitor may select any hyperlink on such page to access additional interesting content.

In addition, the visitor can still be shown other content not necessarily directly related to his or her interests. The visitor can still access these hyperlinks and URLs; therefore, in the preferred embodiment, the visitor file is an evolving file, since the visitor's interests can change over time for a number of reasons. Therefore, the present invention can allow an option to give greater weight to recently accessed Web Content Items.

The server request handler 320 can then update the visitor file data with the categories and keyword counts for the information assembled into the final page that is returned to the visitor's browser. The updated visitor file data is delivered back to the visitor data manager 350 and stored in the visitor data file store 375 by the visitor file manager 370.

FIG. 4 shows another embodiment 400 of the invention wherein there are multiple instances of the Server request handler and associated machinery. Web sites often use this form of functional replication to achieve higher performance by sharing the load across multiple server machines. A load balancer, such as a Cisco Local Director, a DNS round robin, or equivalent technology exists between the web site visitor's browser 410 and a set of server request handlers 431, 432, 433. Each server request handler is a complete copy and typically each one operates on a separate machine. The server request handlers each have their own visitor data manager 441, 442, 443. As a visitor makes multiple requests to the web site, each individual request may be redirected by the load balancer to a different request handle and visitor data manager. Therefore, as the category and keyword counts are updated by each individual server, some special mechanism must be used to ensure that updates are not lost by having one set of visitor data overwrite the results of another. This is the reason for having the visitor file manager 470 as a separate mechanism within the invention. There is only one visitor file manager and it serves as the collection point for all updated data generated by the individual visitor data managers 441, 442, 443. A further refinement is that the visitor data managers communicate an incremental update value to the visitor file manager. For example, consider the case where a visitor makes two requests to the web site, with each request being for a page containing keyword "A". The first request might be handled by server request handler 432 (and visitor data manager 442). The second request might be handled by server request handler 443 (and visitor data manager 443). Each one of these data managers has a visitor profile stating that the visitor saw one instance of the keyword "A". However, when each reports its results back to the visitor file manager 470, the visitor file manager sums the results together thus obtaining the correct value of two instances for the keyword "A". The final results is written into the visitor data file store 475 and made available for future operations.

It should be appreciated by those skilled in the art that the specific embodiments disclosed above may be readily uti-

8

lized as a basis for modifying or designing other methods for carrying out the same purposes of the present invention. It should also be realized by those skilled in the art that such equivalent constructions do not depart from the spirit and scope of the invention as set forth in the appended claims.

What is claimed is:

1. A method of customizing a web site, said method comprising:

labeling content of the web site;

when at least one visitor accesses the content of a web site, registering the labeled accessed content in a personalized data file;

storing the data file for the at least one visitor;

generating at least one pre-customized display for a first visitor;

caching the at least one pre-customized displays on the server computer;

displaying the at least one pre-customized display to the first visitor;

analyzing the data file of a second visitor and associating the second visitor with the at least one pre-customized display, wherein analyzing is performed after generating; and

displaying the at least one pre-customized display to the second visitor, wherein the at least one pre-customized display is not regenerated before displaying the at least one pre-customized display to the second visitor.

2. The method of claim 1 wherein labeling the content of the web site comprises attaching at least one category to each web content item.

3. The method of claim 2 wherein registering the labeled accessed content comprises accumulating the number of accesses to each category in the personalized data file.

4. The method of claim 3 wherein analyzing the data file comprises:

prioritizing the categories in the data file; and

associating the highest weighted category with at least one pre-customized display.

5. The method of claim 1 wherein the pre-customized display is an insert to be placed within a web content item.

6. The method of claim 1 wherein the pre-customized display is a web page.

7. The method of claim 1 wherein the generating of a pre-customized display is not generated until a first visitor first requires such a display.

8. The method of claim 1 wherein storing the data file can be performed by multiple servers operating in parallel, without loss of information.

9. The method of claim 1 wherein the displaying of the pre-customized display comprises inserting a plurality of pre-customized displays onto a web page accessed by the visitor.

10. A computer-readable medium having computer executable software code stored thereon, the code for personalizing a web site without dynamically generated web pages for each visitor, the code comprising:

code for labeling the content of a web site with selected categories;

code for generating a data file for a visitor;

code for accumulating information regarding labeled content, to place such information in the visitor data file;

code for determining the selected category associated with the visitor's interest, wherein such determination is based on the accumulated information in the visitor data file; and

SBJ 00012

US 6,330,592 B1

**9**

code for presenting cached pre-selected web content to the visitor, wherein such pre-selected web content is associated with the selected category.

**11.** A computer readable memory that can direct a web site server computer to function in a specified manner, comprising:

visitor files stored in said computer memory of said web site server computer;

pre-customized web content items stored in said computer memory of said web site server computer; and

executable instructions stored in said computer memory of said web site server computer, said executable instructions including

(a) instructions to access an existing visitor file for a visitor;

(b) instructions to review data in existing visitor file to determine visitor preferences; and

(c) instructions, based on said visitor preferences, to provide pre-customized files to visitor.

**12.** The computer readable memory of claim **11** wherein the pre-customized files are pre-customized web content items.

**13.** The computer readable memory of claim **11** wherein the existing visitor file contains visitor preference data.

**14.** The computer readable memory of claim **13** wherein the visitor preference data contains a count of keywords.

**15.** The computer readable memory of claim **14** wherein the keywords have a weighted value dependent upon the time of access of associated web content.

**16.** A computer program product for operating a web site on a server computer, the computer program product comprising:

a computer usable medium having computer readable program code means embodied in said medium for searching, said computer readable program code means comprising;

**10**

means for labeling the content of a web site;

when at least one visitor accesses the content of a web site, means for registering the labeled accessed content in a personalized data file;

means for storing the data file for at least one visitor;

means for generating a set of pre-customized displays;

means for caching the set of pre-customized displays on the server;

when the at least one visitor accesses a Web Site, means for analyzing the data file of the visitor and associating the user with a precustomized display; and

means for displaying the pre-customized display onto a web page accessed by the visitor.

**17.** Computer executable software code stored on a computer readable medium on a web site server computer, the code for personalizing a web site, the code comprising:

code for labeling the content of a web site with selected categories;

code for generating a data file for a visitor;

code for accumulating information regarding labeled content, to place such information in the visitor data file;

code for determining the selected category associated with the visitor's interest, wherein such determination is based on the accumulated information in the visitor data file; and

code for presenting cached pre-selected web content to the visitor, wherein such pre-selected web content is associated with the selected category.

**18.** The computer executable software code of claim **17** further comprising code for weighting accessed information based on at least one specified variable.

**19.** The computer executable software code of claim **18** wherein the at least one specified variable is time of access.

\* \* \* \* \*

SBJ 00013

1  LYNN H. PASAHOW (CSB NO. 054283)
   lpasahow@fenwick.com
2  J. DAVID HADDEN (CSB NO. 176148)
   dhadden@fenwick.com
3  DARREN E. DONNELLY (CSB NO. 194335)
   ddonnelly@fenwick.com
4  RYAN A. TYZ (CSB NO. 234895)
   rtyz@fenwick.com
5  FENWICK & WEST LLP
   Silicon Valley Center
6  801 California Street
   Mountain View, CA  94041
7  Telephone:    (650) 988-8500
   Facsimile:    (650) 938-5200
8
   Attorneys for Defendants
9  Amazon.com, Inc. and Borders Group, Inc.

10              UNITED STATES DISTRICT COURT

11            NORTHERN DISTRICT OF CALIFORNIA

12               SAN FRANCISCO DIVISION

13

14  SBJ IP HOLDINGS 1, LLC,,              Case No.  3:08-mc-80109 SI

15            Plaintiff,                  (U.S.D.C. Eastern District of Texas)

16  v.                                    MANUAL FILING NOTIFICATION RE
                                          CONFIDENTIAL EXHIBIT 2 TO THE
17  NETFLIX, INC., AMAZON.COM, INC.,      DECLARATION OF RYAN TYZ
    BARNESANDNOBLE.COM, LLC, and
18  BORDERS GROUP, INC.,                  Date:    July 18, 2008
                                          Time:    9:00 a.m.
19            Defendant.                  Dept.:   Courtroom 10, 19th floor
                                          Judge:  The Honorable Susan Illston
20

21

22       **EXHIBIT 2 TO THE DECLARATION OF RYAN TYZ (Confidential)**

23          This filing is in paper or physical form only, and is being maintained in the case file in the

24  Clerk's office.

25          If you are a participant on this case, this filing will be served in hard-copy shortly.

26          For information on retrieving this filing directly from the court, please see the court's

27  main web site at http://www.cand.uscourts.gov under Frequently Asked Questions (FAQ).

28

MFN RE EXHIBIT 2 TO THE DECL                        CASE NO. 3:08-mc-80109 SI
OF RYAN TYZ

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1   This filing was not efiled for the following reason(s):

2   ___ Voluminous Document (PDF file size larger than efiling system allowances)

3   ___ Unable to Scan Documents

4   ___ Physical Object (description): _____

5   ___ Non Graphical/Textual Computer File (audio, video, etc.) on CD or other media

6   **X** Item Under Seal

7   ___ Conformance with the Judicial Conference Privacy Policy (General Order 53).

8   ___ Other (description): _____

9

10

11  Dated: June 13, 2008                          FENWICK & WEST LLP

12

13                                                By: */s/ Ryan Tyz*
                                                                Ryan Tyz

14                                                LYNN H. PASAHOW (CSB NO. 054283)
15                                                lpasahow@fenwick.com
                                                  J. DAVID HADDEN (CSB NO. 176148)
16                                                dhadden@fenwick.com
                                                  DARREN E. DONNELLY (CSB NO.
17                                                194335)
                                                  ddonnelly@fenwick.com
18                                                RYAN TYZ (CSB NO. 234895)
                                                  rtyz@fenwick.com

19                                                FENWICK & WEST LLP
20                                                Silicon Valley Center
                                                  801 California Street
21                                                Mountain View, CA  94041
                                                  Telephone:    (650) 988-8500
22                                                Facsimile:    (650) 938-5200

23                                                Attorneys for Defendants
24                                                Amazon.com, Inc. and Borders Group, Inc.

25

26

27

28

EXHIBIT 3

☐AO88 (Rev. 12/07) Subpoena in a Civil Case

# UNITED STATES DISTRICT COURT
### Northern District of California

SBJ IP HOLDINGS 1, LLC

**SUBPOENA IN A CIVIL CASE**

V.

NETFLIX, INC., AMAZON.COM, INC., BARNESANDNOBLES.COM, LLC, and BORDERS GROUP, INC

Case Number:[1] 2:07-cv-120-CE

(U.S.D.C. Eastern - Texas)

TO:

| | |
|---|---|
| Vignette Corporation | c/o CT Corporation System |
| 55 New Montgomery Street, Suite 619 | 818 West Seventh Street |
| San Francisco, CA 94105 | Los Angeles, CA 90017 |

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

SEE- ATTACHMENT A

| PLACE | DATE AND TIME |
|---|---|
| Fenwick & West, 801 California Street, Mountain View, CA 94041 | May 13, 2008 5:00 p.m. (PST) |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rule of Civil Procedure 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| Ryan A. Tyz, Attorneys for Netflix, Inc., Amazon.com, Inc., and Borders Group, Inc. | May 8, 2008 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Ryan A. Tyz
Fenwick & West LLP
801 California Street, Mountain View, CA 94041 (650) 988-8500

(See Federal Rule of Civil Procedure 45 (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

American LegalNet, Inc.
www.FormsWorkflow.com

## PROOF OF SERVICE

|  | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

## Federal Rule of Civil Procedure 45 (c), (d), and (e), as amended on December 1, 2007:

**(c) Protecting a Person Subject to a Subpoena.**

(1) Avoiding Undue Burden or Expense; Sanctions. A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

(2) Command to Produce Materials or Permit Inspection.

(A) Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

(B) Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) Quashing or Modifying a Subpoena.

(A) When Required. On timely motion, the issuing court must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) When Permitted. To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information;

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

(iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial

(C) Specifying Conditions as an Alternative. In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

**(d) Duties in Responding to a Subpoena.**

(1) Producing Documents or Electronically Stored Information. These procedures apply to producing documents or electronically stored information:

(A) Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

(B) Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

(C) Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.

(D) Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) Claiming Privilege or Protection.

(A) Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

(B) Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) Contempt.**

The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

American LegalNet, Inc.
www.FormsWorkflow.com

## ATTACHMENT A TO SUBPOENA TO VIGNETTE CORPORATION

## DEFINITIONS

A.    "VIGNETTE," "YOU" and "YOUR" as used herein, means Vignette Corporation and any parent entities, subsidiaries, divisions, affiliates, branches, wholly or partly owned entities of VIGNETTE, any and all predecessors and successors thereof, and any entities acting or purporting to act for or on behalf of, or who are subject to the direction or control of, any of the foregoing entities, including agents, employees, officers, directors, attorneys, consultants, contractors, subcontractors and representatives.

B.    "SBJ" as used herein, means the named plaintiff SBJ IP HOLDINGS 1, LLC, and any parent entities, subsidiaries, divisions, affiliates, branches, wholly or partly owned entities of SBJ, any and all predecessors and successors thereof, and any entities acting or purporting to act for or on behalf of, or who are subject to the direction or control of, any of the foregoing entities, including agents, employees, officers, directors, attorneys, consultants, contractors, subcontractors and representatives.

C.    "NETFLIX" as used herein, means one of the named defendants Netflix, Inc., and any parent entities, subsidiaries, divisions, affiliates, branches, wholly or partly owned entities of NETFLIX, any and all predecessors and successors thereof, and any entities acting or purporting to act for or on behalf of, or who are subject to the direction or control of, any of the foregoing entities, including agents, employees, officers, directors, attorneys, consultants, contractors, subcontractors and representatives.

D.    "AMAZON" as used herein, means one of the named defendants Amazon.com, Inc., and any parent entities, subsidiaries, divisions, affiliates, branches, wholly or partly owned entities of AMAZON, any and all predecessors and successors thereof, and any entities acting or purporting to act for or on behalf of, or who are subject to the direction or control of, any of the foregoing entities, including agents, employees, officers, directors, attorneys, consultants, contractors, subcontractors and representatives.

E.    "BORDERS" as used herein, means one of the named defendants Borders Group, Inc., any parent entities, subsidiaries, divisions, affiliates, branches, wholly or partly owned

1   entities of BORDERS, any and all predecessors and successors thereof, and any entities acting or

2   purporting to act for or on behalf of, or who are subject to the direction or control of, any of the

3   foregoing entities, including agents, employees, officers, directors, attorneys, consultants,

4   contractors, subcontractors and representatives.

5         F.     "PATENT-IN-SUIT" as used herein, means U.S. Patent No. 6,330,592, titled

6   "Method, Memory, Product, and Code for Displaying Pre-Customized Content Associated with

7   Visitor Data," dated December 11, 2001.

8         G.     "STORYSERVER" as used herein means YOUR STORYSERVER software

9   product, including all versions and derivatives thereof (including those products under a different

10   name).

11         H.     "NET PERCEPTIONS" as used herein means the company Net Perceptions, Inc.

12   or NPI that Vignette entered into a software license agreement with that has an effective date of

13   April 10, 1998.

14         I.     "Documents" shall mean the original and all non-identical copies of any written,

15   typed, printed, photocopied, photographic, machine-readable, magnetically or optically recorded

16   matter of any kind, or electronically stored information, including, but not limited to, letters,

17   envelopes, forms, affidavits, correspondence, telegraphs, telecopies, telefaxes, paper

18   communications, electronic communications, signed statements, tabulations, charts, memoranda,

19   checks, appointment books, records, proposals, memoranda or other transcriptions by mechanical

20   device, by longhand or shorthand recording, tape recorded or by electronic or any other means,

21   computer-generated information, computer software, computer programs, computer code, intra-

22   office communications, interoffice communications, all summaries of oral communications,

23   telephonic or otherwise, microfiche, microfilm, lists, bulletins, calendars, circulars, desk pads,

24   opinions, ledgers, minutes, agreements, journals, diaries, contracts, invoices, balance sheets,

25   telephone messages or other messages, magazines, pamphlets, articles, notices, newspapers,

26   studies, summaries, worksheets, telexes, cables and all other graphic materials, writings and

27   instruments, however produced or reproduced.  A document includes all documents appended

28   thereto.

1       J.     "Communications" shall refer to all written, oral, telephonic or other inquiries,

2  dialogues, discussions, conversations, interviews, correspondence, consultations, negotiations,

3  agreements, understandings, meetings, letters, notes, telegrams, advertisements, computer mail, e-

4  mail and all other documents evidencing any verbal or nonverbal interaction between persons and

5  entities.

6       K.     The terms "relating to" or "relate to" shall mean concerning, showing,

7  demonstrating, comprising, citing, quoting, regarding, involving, representing, evidencing,

8  constituting, discussing, mentioning, containing, analyzing, supporting, embodying, reflecting,

9  identifying, incorporating, describing, commenting on, referring to, considering, recommending,

10  dealing with or pertaining to in whole or in part.

11       L.     The terms "or" and "and" shall be read in the conjunctive and in the disjunctive

12  wherever they appear, and neither of these words shall be interpreted to limit the scope of these

13  Requests.

14       M.     The singular form of any word shall be deemed to include the plural. The plural

15  form of any word shall be deemed to include the singular.

16       N.     The term "this ACTION" shall refer to *SBJ IP Holdings 1, LLC v. Netflix, Inc., et*

17  *al.*, United States District Court, Eastern District of Texas, Civil Action No. 2:07-cv-120-TJW.

18                        **INSTRUCTIONS**

19       A.     In responding to the following requests, furnish all available documents, including

20  documents in the possession, custody, or control of any of YOUR directors, officers, agents,

21  employees, representatives, associates, investigators or division affiliates, partnerships, parents or

22  subsidiaries, and persons under YOUR control, as well as documents which YOU have a legal

23  right to obtain, not merely documents in the direct possession of VIGNETTE. If you cannot fully

24  respond to the following requests after exercising due diligence to secure the documents

25  requested thereby, so state, and specify the portion of each request that cannot be responded to

26  fully and completely. In the latter event, state what efforts were made to obtain the requested

27  documents.

28       B.     If YOU object to any portion of any request for production of documents, please

1 provide all documents responsive to the portion of the request to which it does not object as soon

2 as possible.

3   C. Electronic records and computerized information must be produced in native

4 format, together with a description of the system from which they were derived sufficient to

5 permit rendering the records and information intelligible.

6   D. Selection of documents from the files and other sources and the numbering of such

7 documents shall be performed in such a manner as to ensure that the source of each document

8 may be determined, if necessary.

9   E. File folders with tabs or labels or directories of files identifying documents called

10 for by these requests must be produced intact with such documents.

11   F. Documents attached to each other shall not be separated.

12   G. If YOU assert that certain documents or things are privileged, please identify:

13     1. The nature of the privilege;

14     2. The author(s) of the documents;

15     3. All recipients of the documents;

16     4. The date the document was created;

17     5. The subject matter to which the document pertains; and

18     6. All persons with access to the documents.

19   H. The requests contained herein are intended to be continuing in nature so as to

20 require supplementation promptly following the discovery of additional responsive information.

21   I. If any request is unclear or ambiguous, please do not delay, but contact counsel for

22 Netflix, Amazon, and Borders, immediately for clarification.

23   J. If YOU consider any documents that YOU are producing to be confidential or

24 highly confidential, please designate them accordingly and such documents will be handled

25 pursuant Patent Local Rule 2-2 of the Eastern District of Texas until entry of a Protective Order.

26       **REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS**

27   1. A copy of each STORYSERVER version licensed, used, or sold after the issuance

28 of the PATENT-IN-SUIT, which is December 11, 2001, as it was used by YOU and/or provided

1    to YOUR users, including but not limited to all accompanying packaging and documentation.

2        2.    All documents marked with the number of the PATENT-IN-SUIT in connection

3    with making, offering for sale or license, sale or license, of any STORYSERVER version or any

4    other of YOUR products.

5        3.    Documents sufficient to show each period between December 11, 2001 and the

6    present that your STORYSERVER product was marked, including the number of units sold and

7    each person to whom it was sold during each such period.

8        4.    Documents sufficient to show each period between December 11, 2001 and the

9    present that STORYSERVER was not marked, including the number of units sold and each

10   person to whom it was sold during each such period.

11       5.    All source code for STORYSERVER versions 3.1, 3.2, 4.0 and 4.1.

12       6.    All documents relating to the implementation and/or incorporation of

13   STORYSERVER versions 3.1, 3.2, 4.0 or 4.1 in any user or customer websites on or before

14   December 11, 2001.

15       7.    All documents relating to NET PERCEPTIONS.

EXHIBIT 4

# FENWICK & WEST LLP

SILICON VALLEY CENTER   801 CALIFORNIA STREET   MOUNTAIN VIEW, CA 94041
TEL 650.988.8500   FAX 650.938.5200   WWW.FENWICK.COM

May 23, 2008

RYAN A. TYZ

EMAIL RTYZ@FENWICK.COM
DIRECT DIAL (650) 335-7135

**VIA E-MAIL**

Sue Dillon Ayers, Esq.
1500 San Jacinto Center
98 San Jacinto Boulevard
Austin, Texas  78701-4078

> Re:     SBJ Holdings 1, LLC v. Netflix, et al.
>           U.S.D.C. (Western) Case No. A07-MC-00729-SS

Dear Sue:

I write to memorialize our telephone conference of May 21, 2008 regarding Defendants' N.D. Cal. subpoena to Vignette, and further to our conversation today regarding a hearing schedule.  Please contact me immediately if you feel I have described any part of our discussion inaccurately.[1]

**Request No. 1**

As I explained, this request seeks a copy of each StoryServer version, including any derivative product, licensed, used, or sold *after* the issuance of the patent-in-suit, which is December 11, 2001.  Vignette recently produced StoryServer 5.0, and agreed to produce derivative StoryServer products V/5 and V/6.  However, Vignette claimed that it did not consider subsequent versions, such as V/7, as derivatives of StoryServer because the coding language and functionality changed.  Defendants disagree with this contention, as Vignette markets those products as providing personalization as claimed by the patent-in-suit, Vignette's CTO previously represented to me that current Vignette products are derived from the original StoryServer code such that heightened confidentiality restrictions are necessary for the production of that original code, and Vignette obtained in 2007 a license grant back to the patent-in-suit for all of its products.  If Vignette does not produce these subsequent versions, Defendants will need access to the source code for them to determine whether they do in fact embody the patents-in-suit.  Please let me know how Vignette would like to proceed on this request.

/ / /

/ / /

---

[1] Defendants understand that Vignette's agreement to produce documents under certain requests in the N.D. Cal. subpoena is made without prejudice to its arguments in the motion to quash.

Sue Dillon Ayers, Esq.
May 23, 2008
Page 2

**Request No. 2**

    This request seeks any document marked with the number of the patent-in-suit in connection with the sale of any Vignette product.  Vignette agreed to produce documents under this request, but it has yet to locate any responsive documents and believes that none exist.  Please confirm Vignette's agreement to produce documents called for by this request to the extent any exist.

    **Request Nos. 3 and 4**

    These requests seek documents sufficient to show each period when Vignette did and did not mark StoryServer, including derivatives, and the number of units sold and to whom during each such period.  Since Vignette appears not to have marked any of its products with the patent-in-suit, and claimed it was unduly burdensome to provide sales figures, I proposed that Vignette provide a stipulation stating that it has not marked any of its products, including accompanying documentation, with the patent-in-suit, that it has sold such products after the issuance date, and such products embody the patented subject matter.  You were looking into providing the sales figures, and would check with your client regarding whether a stipulation was a viable alternative.

**Request No. 5**

    This request seeks the source code for StoryServer versions 3.1, 3.2, 4.0 and 4.1.  Vignette has agreed to make this information available at its escrow facility, Iron Mountain, in Union City, California.  Defendants propose that the following individuals have access to such materials:  David Hadden, Darren Donnelly, Hector Ribera, Carolyn Chang, and Ryan Tyz.  I also noted that we would need to allow access to our expert, whose name(s) we will provide at a later date.  Section 20(h) of the interim protective order limits the printing of such materials.  Please confirm that Vignette is okay to proceed under this provision.

**Request No. 6**

    This request seeks documents relating to Vignette's provision, including the implementation and/or incorporation, of its StoryServer versions 3.1, 3.2, 4.0 and 4.1 to any user or customer of websites on or before December 11, 2001.  Vignette has refused to produce any information in response to this request, even though I have explained the information is relevant, to among other things, the validity of the patent-in-suit.  In an attempt to compromize, Defendants' are willing to limit this request to those documents that refer to the personalization, customization, or recommendation features of the StoryServer products.  Please let me know whether this limitation is acceptable to Vignette.

/ / /

Sue Dillon Ayers, Esq.
May 23, 2008
Page 3

## Request No. 7

      This request seeks all documents relating to Net Perceptions. Vignette has agreed to produce documents under this request, and I understand that has just recently produced all such documents. Please confirm that this is accurate.

## Hearing Schedule

      As we discussed, to allow additional time for the parties to meet and confer to resolve the remaining outstanding items and, to the extent necessary, provide for enough time to have any motion to compel by defendants briefed and heard at the same time as Vignette's motion to quash, we were in agreement that the best solution was to move the current hearing date, which is June 20, 2008, to the next available hearing date before Judge Illston, which is July 18, 2008. This would provide for the following schedule:

| | |
|---|---|
| Defendants' motion to compel | June 13, 2008 |
| Defendants' opposition to motion to quash; Vignette's opposition to motion to compel | June 27, 2008 |
| Defendants' reply re motion to compel; Vignette's reply re motion to quash | July 3, 2008 |
| Hearing on both motions | July 18, 2008 |

Please let me know if this briefing/hearing schedule is acceptable to Vignette. If so, I will prepare a stipulation accordingly.

      I propose we talk on Tuesday, May 27, 2008 to follow up on the outstanding items.

                  Sincerely,

                  Fenwick & West LLP


                  */s/ Ryan A. Tyz*
                  Ryan A. Tyz

# EXHIBIT 5

# BAKER BOTTS LLP

1500 SAN JACINTO CENTER
98 SAN JACINTO BLVD.
AUSTIN, TEXAS
78701-4078

TEL  +1 512.322.2500
FAX  +1 512.322.2501
www.bakerbotts.com

AUSTIN
BEIJING
DALLAS
DUBAI
HONG KONG
HOUSTON
LONDON
MOSCOW
NEW YORK
RIYADH
WASHINGTON

May 6, 2008

VIGNETTE CORPORATION
Netflix/Amazon Subpoena
068422.0106

Susan Dillon Ayers
TEL  +1 512.322.2663
FAX  +1 512.322.8390
sue.ayers@bakerbotts.com

BY CERTIFIED MAIL AND EMAIL

Ryan Tyz
Fenwick & West
801 California St.
Mountain View, CA 94041

Re:    *SBJ IP Holdings 1, LLC v. Netflix, Inc., Amazon.Com, Inc., Barnesandnoble.com,*
       *LLC, and Borders Group, Inc.*; Cause No. 2:07-cv-120-CE in the Eastern District
       of Texas.

Dear Ryan:

In August 2007 you issued a third-party subpoena out of the Western District of Texas to my client Vignette, which has its headquarters in this district. Vignette filed a motion for protection, which was granted by the Honorable Sam Sparks of the Austin Division. Since then, Vignette has voluntarily produced many of the materials that were the subject of the subpoena.

In January 2008 the Court issued a show cause order, to which you made no response. Therefore, on February 7, 2008 the Court dismissed cause number A-07-CV-729-SS without prejudice. Since then, Vignette has produced additional information and the parties have agreed to the production of source code for select versions of StoryServer at Iron Mountain in Union City, California. This location was chosen because Iron Mountain is Vignette's escrow agent and Union City is their closest facility to your offices.

In mid-April, in a conversation regarding new requests that were outside the scope of the original subpoena, you asked if I would accept service of a new subpoena on behalf of Vignette. Presuming that the new subpoena would issue from the Western District of Texas, I agreed. I am in receipt of your new subpoena, dated April 23, 2008 and issuing from the Northern District of California. I concluded that this choice of venue for the new subpoena was in error, but you have informed me that it was intentional.

I note that Requests for Production 1-5 in the new subpoena are identical to the requests on which Judge Sparks granted Vignette's motion for protection. Vignette has worked to voluntarily satisfy your requests in a professional, courteous, and timely manner without the need for additional Court intervention. Your attempt to circumvent Judge Spark's order by

**BAKER BOTTS** LLP

Ryan Tyz                              - 2 -                              May 6, 2008

issuing the same requests in a new venue will certainly impede the expedient resolution of these matters.

As I told you in our phone call of May 5, 2008, I did not, and would not have, agreed to accept service of a subpoena issuing from the Northern District of California.  I understand that you will issue a new subpoena and effect proper service on Vignette, at which time Vignette will respond pursuant to the Federal Rules of Civil Procedure.

As you requested, I am commemorating these events in writing by delivery of this letter.

Sincerely,

Susan Dillon Ayers

SDA:sda

EXHIBIT 6

AO88 (Rev. 12/06) Subpoena in a Civil Case

**Issued by the**

# UNITED STATES DISTRICT COURT

Western    DISTRICT OF Texas

SBJ HOLDINGS 1, LLC

                                        **SUBPOENA IN A CIVIL CASE**

                    V.

NETFLIX, INC., AMAZON.COM, INC.,        Case Number:[1] 2:07-CV-120-TJW
BARNESANDNOBLE.COM, LLC, and BORDERS    (U.S.D.C. Eastern - Texas)
GROUP, INC.

TO: Vignette Corporation
    1301 S. MoPac Expressway #100
    Austin, TX  78746-6947

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | **DATE AND TIME** |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

Attachment A

| PLACE | DATE AND TIME |
|---|---|
| Vignette Corporation 1301 S. MoPac Expressway #100 Austin, TX  78746-6947 | August 28, 2007 |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| _Blake C. Erskine_  Attorneys for NETFLIX, INC., AMAZON.COM, INC., | August 7, 2007 |

ISSUING OFFICER'S NAME ADDRESS AND TELEPHONE NUMBER
Blake C. Erskine, Erskine & McMahon, LLP, P.O. Box 3485, Longview, Texas 75606
(903) 757-8435

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

                                                                                            AO-88

AO88 (Rev. 12/06) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____

| DATE | SIGNATURE OF SERVER |
|---|---|

| | ADDRESS OF SERVER |
|---|---|

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2006:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection, copying, testing, or sampling of designated electronically stored information, books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection, copying, testing, or sampling may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to producing any or all of the designated materials or inspection of the premises — or to producing electronically stored information in the form or forms requested. If objection is made, the party serving the subpoena shall not be entitled to inspect, copy, test, or sample the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production, inspection, copying, testing, or sampling. Such an order to compel shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection, copying, testing, or sampling commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held;

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) (A) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(B) If a subpoena does not specify the form or forms for producing electronically stored information, a person responding to a subpoena must produce the information in a form or forms in which the person ordinarily maintains it or in a form or forms that are reasonably usable.

(C) A person responding to a subpoena need not produce the same electronically stored information in more than one form.

(D) A person responding to a subpoena need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or to quash, the person from whom discovery is sought must show that the information sought is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) (A) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial-preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

(B) If information is produced in response to a subpoena that is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has and may not use or disclose the information until the claim is resolved. A receiving party may promptly present the information to the court under seal for a determination of the claim. If the receiving party disclosed the information before being notified, it must take reasonable steps to retrieve it. The person who produced the information must preserve the information until the claim is resolved.

e) CONTEMPT. Failure of any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena was issued. An adequate cause for failure to obey exists when a subpoena purports to require a nonparty to attend or produce at a place not within the limits provided by clause (ii) of subparagraph (c)(3)(A).

1

2

## ATTACHMENT A TO SUBPOENA TO VIGNETTE CORPORATION

## DEFINITIONS

3    A.    "VIGNETTE," "YOU" and "YOUR" as used herein, means Vignette Corporation

4 and any parent entities, subsidiaries, divisions, affiliates, branches, wholly or partly owned

5 entities of VIGNETTE, any and all predecessors and successors thereof, and any entities acting or

6 purporting to act for or on behalf of, or who are subject to the direction or control of, any of the

7 foregoing entities, including agents, employees, officers, directors, attorneys, consultants,

8 contractors, subcontractors and representatives.

9    B.    "SBJ" as used herein, means the named plaintiff SBJ HOLDINGS 1, LLC, and

10 any parent entities, subsidiaries, divisions, affiliates, branches, wholly or partly owned entities of

11 SBJ, any and all predecessors and successors thereof, and any entities acting or purporting to act

12 for or on behalf of, or who are subject to the direction or control of, any of the foregoing entities,

13 including agents, employees, officers, directors, attorneys, consultants, contractors,

14 subcontractors and representatives.

15    C.    "NETFLIX" as used herein, means one of the named defendants Netflix, Inc., and

16 any parent entities, subsidiaries, divisions, affiliates, branches, wholly or partly owned entities of

17 NETFLIX, any and all predecessors and successors thereof, and any entities acting or purporting

18 to act for or on behalf of, or who are subject to the direction or control of, any of the foregoing

19 entities, including agents, employees, officers, directors, attorneys, consultants, contractors,

20 subcontractors and representatives.

21    D.    "AMAZON" as used herein, means one of the named defendants Amazon.com,

22 Inc., and any parent entities, subsidiaries, divisions, affiliates, branches, wholly or partly owned

23 entities of AMAZON, any and all predecessors and successors thereof, and any entities acting or

24 purporting to act for or on behalf of, or who are subject to the direction or control of, any of the

25 foregoing entities, including agents, employees, officers, directors, attorneys, consultants,

26 contractors, subcontractors and representatives.

27    E.    "BORDERS" as used herein, means one of the named defendants Borders Group,

28

ATTACHMENT A TO SUBPOENA TO          Civil Action No.    2:07-cv-120-TJW
VIGNETTE
- 1 -

1    Inc., any parent entities, subsidiaries, divisions, affiliates, branches, wholly or partly owned

2    entities of BORDERS, any and all predecessors and successors thereof, and any entities acting or

3    purporting to act for or on behalf of, or who are subject to the direction or control of, any of the

4    foregoing entities, including agents, employees, officers, directors, attorneys, consultants,

5    contractors, subcontractors and representatives.

6          F.          "PATENT-IN-SUIT" as used herein, means U.S. Patent No. 6,330,592, titled

7    "Method, Memory, Product, and Code for Displaying Pre-Customized Content Associated with

8    Visitor Data," dated December 11, 2001.

9          G.          "PATENT SUBJECT MATTER" as used herein, means any method, program(s),

10    application, use, product, or code for displaying pre-customized content associated with user

11    visitor data.

12          H.          "INVENTORS" as used herein, means the inventors listed on the PATENT-IN-

13    SUIT, Michael K. Makuch and Neil Webber.

14          I.          "STORYSERVER" as used herein means YOUR STORYSERVER software

15    product, including all versions and derivatives thereof.

16          J.          "Documents" shall mean the original and all non-identical copies of any written,

17    typed, printed, photocopied, photographic, machine-readable, magnetically or optically recorded

18    matter of any kind, or electronically stored information, including, but not limited to, letters,

19    envelopes, forms, affidavits, correspondence, telegraphs, telecopies, telefaxes, paper

20    communications, electronic communications, signed statements, tabulations, charts, memoranda,

21    checks, appointment books, records, proposals, memoranda or other transcriptions by mechanical

22    device, by longhand or shorthand recording, tape recorded or by electronic or any other means,

23    computer-generated information, computer software, computer programs, computer code, intra-

24    office communications, interoffice communications, all summaries of oral communications,

25    telephonic or otherwise, microfiche, microfilm, lists, bulletins, calendars, circulars, desk pads,

26    opinions, ledgers, minutes, agreements, journals, diaries, contracts, invoices, balance sheets,

27    telephone messages or other messages, magazines, pamphlets, articles, notices, newspapers,

28    studies, summaries, worksheets, telexes, cables and all other graphic materials, writings and

ATTACHMENT A TO SUBPOENA TO                    Civil Action No.      2:07-cv-120-TJW
VIGNETTE

- 2 -

1    instruments, however produced or reproduced.  A document includes all documents appended

2    thereto.

3         K.     "Communications" shall refer to all written, oral, telephonic or other inquiries,

4    dialogues, discussions, conversations, interviews, correspondence, consultations, negotiations,

5    agreements, understandings, meetings, letters, notes, telegrams, advertisements, computer mail, e-

6    mail and all other documents evidencing any verbal or nonverbal interaction between persons and

7    entities.

8         L.     The terms "relating to" or "relate to" shall mean concerning, showing,

9    demonstrating, comprising, citing, quoting, regarding, involving, representing, evidencing,

10   constituting, discussing, mentioning, containing, analyzing, supporting, embodying, reflecting,

11   identifying, incorporating, describing, commenting on, referring to, considering, recommending,

12   dealing with or pertaining to in whole or in part.

13        M.     The terms "or" and "and" shall be read in the conjunctive and in the disjunctive

14   wherever they appear, and neither of these words shall be interpreted to limit the scope of these

15   Requests.

16        N.     The singular form of any word shall be deemed to include the plural. The plural

17   form of any word shall be deemed to include the singular.

18        O.     The term "this ACTION" shall refer to *SBJ Holdings 1, LLC v. Netflix, Inc., et*

19   *al.*, United States District Court, Eastern District of Texas, Civil Action No. 2:07-cv-120-TJW.

20                          **INSTRUCTIONS**

21        A.     In responding to the following requests, furnish all available documents, including

22   documents in the possession, custody, or control of any of YOUR directors, officers, agents,

23   employees, representatives, associates, investigators or division affiliates, partnerships, parents or

24   subsidiaries, and persons under YOUR control, as well as documents which YOU have a legal

25   right to obtain, not merely documents in the direct possession of VIGNETTE.  If you cannot fully

26   respond to the following requests after exercising due diligence to secure the documents

27   requested thereby, so state, and specify the portion of each request that cannot be responded to

28   fully and completely.  In the latter event, state what efforts were made to obtain the requested

ATTACHMENT A TO SUBPOENA TO            Civil Action No.    2:07-cv-120-TJW
VIGNETTE
                                       - 3 -

1    documents.

2        B.    If YOU object to any portion of any request for production of documents, please

3    provide all documents responsive to the portion of the request to which it does not object as soon

4    as possible.

5        C.    Electronic records and computerized information must be produced in native

6    format, together with a description of the system from which they were derived sufficient to

7    permit rendering the records and information intelligible.

8        D.    Selection of documents from the files and other sources and the numbering of such

9    documents shall be performed in such a manner as to ensure that the source of each document

10    may be determined, if necessary.

11        E.    File folders with tabs or labels or directories of files identifying documents called

12    for by these requests must be produced intact with such documents.

13        F.    Documents attached to each other shall not be separated.

14        G.    If YOU assert that certain documents or things are privileged, please identify:

15            1.    The nature of the privilege;

16            2.    The author(s) of the documents;

17            3.    All recipients of the documents;

18            4.    The date the document was created;

19            5.    The subject matter to which the document pertains; and

20            6.    All persons with access to the documents.

21        H.    The requests contained herein are intended to be continuing in nature so as to

22    require supplementation promptly following the discovery of additional responsive information.

23        I.    If any request is unclear or ambiguous, please do not delay, but contact counsel for

24    Netflix, Amazon, and Borders, immediately for clarification.

25        J.    If YOU consider any documents that YOU are producing to be confidential or

26    highly confidential, please designate them accordingly and such documents will be handled

27    pursuant Patent Local Rule 2-2 of the Eastern District of Texas until entry of a Protective Order.

28

ATTACHMENT A TO SUBPOENA TO        Civil Action No.    2:07-cv-120-TJW
VIGNETTE
                                    - 4 -

## REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS

1.    All documents relating to the research, design, development, implementation, operation, evaluation, or testing of STORYSERVER or the PATENT SUBJECT MATTER prior to December 5, 1998, including but not limited to specifications, user manuals, programmer guides, demonstrations, application notes, operating handbooks, operating instructions, datasheets, diagrams, schematics, software, firmware, source code, object code, executable code, software language references, test plans, test procedures, test results, test documents, documents related to shared development projects, press releases, product roadmaps, white papers, marketing collateral, and related communications such as email and memoranda.

2.    Documents sufficient to evidence each discussion with, or disclosure to, or other manner of providing to a third party, or sale/license of, offer to sell/license, or other prospective or actual commercialization of, the STORYSERVER product or the PATENT SUBJECT MATTER prior to December 5, 1998, including but not limited to contracts, purchase orders, invoices, advertisements, marketing materials, offer letters, beta testing agreements, and third party or joint development agreements.

3.    All documents and communications relating to the PATENT-IN-SUIT, including but not limited to patent applications, opinions, summaries, descriptions, analysis, notes, notebooks, valuations, drafts, prior art searches, assignments, mortgages, transfers, agreements, licenses, or offers to license.

4.    All documents and communications referring or relating to SBJ, NETFLIX, AMAZON or BORDERS.

5.    All documents and communications relating to this ACTION, including but not limited documents relating to YOUR interest in this ACTION.

ATTACHMENT A TO SUBPOENA TO VIGNETTE

Civil Action No.    2:07-cv-120-TJW

- 5 -

EXHIBIT 7

# BAKER BOTTS LLP

1500 SAN JACINTO CENTER
98 SAN JACINTO BLVD.
AUSTIN, TEXAS
78701-4078

TEL  +1 512.322.2500
FAX +1 512.322.2501
www.bakerbotts.com

AUSTIN
BEIJING
DALLAS
DUBAI
HONG KONG
HOUSTON
LONDON
MOSCOW
NEW YORK
RIYADH
WASHINGTON

February 28, 2008

068422.0106

Susan Dillon Ayers
TEL  +1 512.322.2663
FAX +1 512.322.8390
sue.ayers@bakerbotts.com

BY ELECTRONIC MAIL

Ryan A. Tyz
Fenwick & West LLP
Silicon Valley Center
801 California Street
Mountain View, California 94041

Re:    Cause No. A07-MC-00729-SS; *SBJ Holdings 1, LLC v. Netflix, et al.*; In the U.S. District Court for the Western District of Texas, Austin Division

Dear Ryan:

In response to your request for additional documents and information, I provide the information below and enclosed documents.

You have requested documents relating to the incorporation of the patented subject matter in StoryServer, such as design specifications and market requirement documents. Vignette has already produced all responsive documents under its control. A diligent search of legacy systems was conducted and Vignette was unable to verify that such documents, aside from those already produced, were ever created. To the extent such documents ever existed, Vignette no longer has any record of them.

You have requested that Vignette produce the source code for versions 3.1 and 4.0 of StoryServer. Vignette has previously offered to produce this source code and make it available through the duration of your lawsuit at Iron Mountain, but you have rejected this offer. Iron Mountain has facilities at 29555 Kouhoutek Way, Union City, California. If you decide to accept this offer, please contact me to discuss the details.

You have requested documents sufficient to corroborate the dates of conception and/or reduction to practice of each claim of the patent-in-suit, and the identity of the person(s) conceiving such claim. Vignette has previously produced any information responsive to this request. After conducting a diligent search of legacy systems and files, Vignette does not have any additional documents that are responsive to this request.

You have requested all Vignette's agreements with third parties that provide personalization, caching, collaborative filtering, content labeling, and/or similar functionality. You identified CNET[1], GroupLens[2], FireFly, and Aria[3] as examples of such third parties in

---

[1]  All such agreements between CNET and Vignette are subject to confidentiality agreements; therefore, they will not be produced.

**BAKER BOTTS** LLP

Ryan A. Tyz                              - 2 -                        February 28, 2008

whom you are interested.  Vignette has identified and hereby produces all such documents with Net Perceptions, Inc., Firefly Network, Inc., Sageware, Inc., OnDisplay, Inc., and Andromedia, Inc.

You have requested documents referring to any analysis and/or operation of the Netflix, Amazon, or Borders websites for the purpose of developing the patent-in-suit, or developing claims of patent infringement against Defendants.  Vignette has conducted a diligent search and has found no responsive documents.  Vignette has been unable to locate any evidence that any analysis of Defendants' web sites was conducted for the purpose of analyzing their operation, developing the patent-in-suit, or developing the claims of patent infringement against Defendants.

You have requested all written communications exchanged with SBJ or its counsel relating to the underlying action.  Vignette hereby produces those documents that are responsive to this request.

Should you have any questions, please contact me.

Sincerely,

Susan Dillon Ayers

SDA:bjm

Enclosures

---

[2] GroupLens is not a third party; rather this is the product name for technology produced by Net Perceptions.

[3] Aria is not a third party; rather it is the product name for technology produced by Andromedia.

# EXHIBIT 8



**Vignette Support Services. Enabling your success with our solutions.**

Today. Tomorrow. Next year. For years to come.

## Vignette® Support Services

You've made a significant investment placing a highly praised and precisely architected Vignette solution at the core of your business processes. Now help ensure it's running at optimum performance, with Vignette Support Services.

## Our commitment to help you improve business efficiency goes far beyond the install.

Our customers are our most important asset. To help ensure you stay completely satisfied with your choice in Vignette, we give you an inside edge: access to powerful tools and expertise that help sustain the new efficiencies gained with our solutions. Our support offerings are a perfect example. From customer centric self-service applications to 1:1 worldwide support, we've created comprehensive service plans that are unique in the industry in their scope and effectiveness.

## Proactive—We've extended this high-level feature into ALL of our plans.

We understand the value of your employee, system and operational productivity. That's why we go far beyond what most other technology providers offer their customers. All levels of Vignette support include proactive features based on your business needs–such as upgrade support, Go-Live assistance and e-mail notifications–to help you avoid issues before they even become issues. No matter what business environment your Vignette investment involves, it can benefit greatly from proactive attention to help keep it running optimally.

## Flexible—You have a choice.

It may be the most important aspect of our maintenance offerings. After all, one size does not fit all. To help ensure that you have the exact resources and plans you need to get the most out of your Vignette-enabled processes, we've created a three-tiered support structure to put you in control of what is most valuable to your business. It not only provides world-class assistance, but is also uniquely focused on supporting different levels of business environment and priority–from development settings to mission-critical applications.



## Get the right information at the right time.

No one knows Vignette software better than we do. And no one knows how to support it more effectively. That's why we're able to offer several unique approaches to help ensure your Vignette investment continues to deliver value.

With more than 1600 customers and thousands of successful implementations completed, we have the experience and expertise you need when it counts most.

### Top level engineers from the start.

When you need support, the only thing on your mind is how quickly the issue can be resolved. At Vignette our engineers own the issue through the entire lifecycle, improving resolution time because the issue is immediately assigned to the very person that can take care of the problem. Our Level 1 support engineers would have Level 3 qualifications at other companies, so it's no wonder 96% of all tickets are resolved at level one.

### Personal attention for solving problems

For Vignette's largest clients with Enterprise level support, we offer an even greater intensity of hands-on attention. Our Enterprise Account Managers are ready to serve as expert liaisons and single points-of-contact providing direct problem management and priority access to in-depth technical skills. A Vignette Technical Advocate can also be requested. This senior Support engineer acts as a focal point for your company's needs during a crucial time period or project, such as a mission-critical upgrade.

### Powerful online self-help.

Many challenges can be handled easily if you know where to look for answers. The Vignette Online Support System (VOLSS) provides around-the-clock access to knowledge base items. VOLSS also enables one-touch escalation of tickets to support management, if necessary. This provides you with more immediate access to solutions for a more satisfying experience.

Given our combined experience, flexibility and proactive services it's easy to see why Vignette Support Services average 4.5 out of 5 based on customer satisfaction ratings, well above the industry average.

### Work with the efficiency experts.

Vignette solutions help organizations harness the power of information and the Web to achieve measurable improvements in business efficiency. We have proven technology and a long track record of successful implementation in most major industries and our customers comprise some of the largest and most demanding companies in the world.

The American Business Awards recognized Vignette's Enterprise Account Management Program as the Best Customer Service Team. The program was recognized for its commitment to customer service and satisfaction.





## Reduced risks = reduced costs.

The connection between effective maintenance and your business goals is clear. Keeping your operation up and running is vital. With Vignette Support Services, you can be sure you're fully leveraging your investment by helping to limit downtime and continually adding new functionality.

### The choice is yours.

Choose the plan that best matches your business requirements, the complexity of your operations and your staff's technology expertise. No matter which you choose, you can count on our commitment to helping you leverage your investment with Vignette.

Let us show you how you can continue realizing the most ROI.

For more information about how Vignette Support Services can complement your Vignette solutions, visit www.vignette.com or e-mail us at maintenance_renewals@vignette.com. If you would like to speak directly to an account manager, please call 888.608.9900.

## Basic (Limited):
Ideal for development environments

Exactly what you need for development environments or non-mission critical applications requiring only business hour support and access to software upgrades and updates.

- Business hours telephone support coverage
- VOLSS electronic access
- Four named contacts
- Proactive services including:
  - Notification of upgrades/ patches/new releases
  - Scheduled Go-Live assistance – business hours
  - Scheduled Upgrade support – business hours

## Extended (Standard):
For non-mission critical applications

Ideal for non-mission critical applications that require some after hours support. Includes everything in Basic, plus:

- Extended telephone coverage support–5x12
- Two additional named contacts, for a total of six
- 7x24 support for critical[+] issues
- 7x24 technical escalation for critical[+] issues
- Remote diagnostics
- Proactive services including:
  - Scheduled 7x24 Go-Live assistance
  - Scheduled 7x24 Upgrade support

## Enterprise (Premium):
For mission-critical applications

A must for companies that use Vignette for mission-critical applications where downtime has a major impact on internal operations and customer service. Includes everything in Extended, plus:

- Two additional named contacts, for a total of eight
- Around-the-clock management escalation
- 7x24 support for critical[+] and major[++] issues
- 7x24 technical escalation for critical[+] and major[++] issues
- Account reporting

## Enterprise Plus: Add-on support services

Specialized Enterprise level add-on support services:

- Technical advocacy
- Enterprise account manager

3

## Summary of Support Levels

| Support Level | Basic *(Limited)* | Extended *(Standard)* | Enterprise *(Premium)* |
|---|---|---|---|
| Management Escalation | Business hours | Business hours | 7x24 |
| Technical Escalation | Business hours | 7x24 for critical issues | 7x24 for critical and major issues |
| Knowledge Base | X | X | X |
| VGM | X | X | X |
| Code Samples | X | X | X |
| Named Contacts | 4 | 6 | 8 |
| Telephone Support (VOLSS) | X | X | X |
| E-mail Notification Services | X | X | X |
| Software Upgrades, Updates and Patch Releases | X | X | X |
| Technical Documents and Whitepapers | X | X | X |
| Case Reporting | X | X | X |
| Go-Live Assistance (Scheduled) | Business hours | 7x24 | 7x24 |
| Upgrade Support (Scheduled) | Business hours | 7x24 | 7x24 |
| Remote Accessibility | | X | X |
| 7x24 Critical Issues | | X | X |
| 7x24 Major Issues | | | X |
| Account Reporting | | | X |
| Technical Advocacy✓ | | | X |
| Enterprise Account Manager✓ | | | X |

SppSvcOffer_0105

+Critical = Production install of a Vignette program is inoperable and severely impacting normal business operations.

++Major = Production or non-production install of a Vignette program is impaired and is severely impacting normal business or development operations.

✓Fee based option that may be added onto Enterprise level support



4

**Vignette Corporate Headquarters**
1301 South MoPac Expressway
Suite 100
Austin, TX 78746-5776
512.741.4300 Tel
512.741.4500 Fax
888.608.9900 Toll-Free
E-mail info@vignette.com

**Vignette Latin America**
305.789.6603 Tel
305.789.6612 Fax
lainfo@vignette.com

**Vignette Europe/Middle-East/Africa**
44.1628.77.2000 Tel
44.1628.77.2266 Fax
euroinfo@vignette.com

**Vignette Asia-Pacific**
61.2.9455.5000 Tel
61.2.9455.5200 Fax
asiapacinfo@vignette.com

Publication Date: January 2005. Vignette does not warrant, guarantee, or make representations concerning the contents of this document. All information is provided "AS-IS," without express or implied warranties of any kind including, without limitation, the warranties of merchantability, fitness for a particular purpose, quality and title. You may not achieve the same results or benefits from using Vignette as described in this document. Nothing in this document is considered to be part of any product documentation or specification for any purpose. Features and functionalities of Vignette software may be licensed in one or more separately priced software programs or modules. Vignette reserves the right to change the contents of this document and the features or functionalities of its products and services at any time without obligation to notify anyone of such changes. Copyright 2005 Vignette Corporation. All rights reserved. Vignette, the V Logo, e:fficiency and e:fficiency experts are trademarks or registered trademarks of Vignette Corporation in the United States and other countries. All other company, product and service names, and brands are the trademarks or registered trademarks of their respective owners.



White Paper
September 2006

# Vignette® Solutions Methodology Overview



## Introduction

For ten years, Vignette has shown organizations worldwide how to transform their content from a liability to an asset. Vignette's software and expertise help these organizations harness the power of the records, documents, Web pages, images, multimedia and other unstructured content to create new opportunities, expand profits, and realize greater savings and efficiencies.

The Vignette® Solutions Methodology (VSM) is an implementation framework that helps Vignette customers, consultants and partners develop Vignette solutions as quickly and successfully as possible. VPS consultants use VSM to identify and address key strategic and tactical issues, and to develop a blueprint for implementing the solution. VSM prescribes four stages of activities that are iterative in nature, enabling the project team to implement the system in stages so that customers can quickly begin to reap benefits.

VSM provides a full set of methods, best practices, and tools, and is supported by targeted service offerings designed to accelerate the development process, maximize return on investment, and reduce the risk of overlooking elements critical to the success of the project. VSM is about your success.

## VSM Life Cycle

The VSM life cycle consists of four phases, as shown below. The initial implementation stage uses out-of-the-box product features for a rapid deployment of the initial release, followed by stages for enhancements and extensions to the deployed system.



**Phase 1: Discovery Phase**

In the Discovery Phase, strategies are developed that will serve as the baseline for single or multiple implementation phases through an Implementation Strategy and Assessment service offering. This offering is based on Vignette's Content Management Blueprint and Portal best practices, and includes analysis of business goals, content and workflow analysis, and definition of portal users, groups, pages and modules that will be used to guide the subsequent implementation efforts.

### Typical Roles of the Discovery Phase

| Roles | Discovery Phase Responsibilities |
|---|---|
| **Client Sponsor** | Primary client decision maker. Drives business goals and metrics for the application. |
| **Implementation Consultant** | Definition of business goals and development of functional requirements based on best practices. Defines the proposed methods used to solve specific business application needs with features from Vignette or third-party products. |
| **Client Subject Matter Expert** | Source for business requirements |
| **Client or VPS Business Analyst** | Performs gap analysis and identifies extensions to the product. |

**Discovery Phase Activities**

- Install the development and pilot content management environments
- Conduct project kickoff meeting to define project strategies for:
  - Project team roles and responsibilities
  - Risk and change management
  - Communications plan
- Review best practices and demonstrate product features
- Define measurable business goals for the application in the Project Charter
- Define implementation strategy and initial project plan
- Review content management and portal out-of-the-box functionality, and document any product extensions

- Develop a content migration plan
- Define training needs through a Competency Assessment offering

**Discovery Phase Deliverables**

- Project Charter
- Gap Analysis Document
- Content Migration Plan

For more information on roles, please refer to the VSM Team Model document.

**Phase 2: Design and Architecture Phase**

The objective of the Design and Architecture Phase is to define the approach to be used in configuring and building components of the system based on the requirements. This phase includes defining the hardware, software and implementation resources that will be used for the effort, developing the technical design for product extensions, and defining the timeline for rollout of identified functionality. The phase objectives are supported by Application Architecture Review and System Architecture Review service offerings.

**Typical Roles of the Design & Architecture Phase**

| Roles | Design & Architecture Phase Responsibilities |
|---|---|
| **Technical Architect** | System design and architecture of necessary customization. Review of architecture and deployment for performance and stability considerations. |
| **Technical Lead** | Design of the application, integrations and extensions. |
| **Usability/User Experience Designer** | User Interface design based on usability best practices. |
| **Client Change Management Coordinator** | Coordinates all tasks associated with transitioning to a new organizational structure or processes. |
| **Implementation Consultant** | Prepares the detailed project schedule by working with the project team. |

**Design and Architecture Phase Activities**

- Design and document the System Architecture based on best practice configurations
- Design and document the Application Architecture, including integrations and product extensions
- Configuration of standard content types, classification taxonomy, workflows, sites and channels
- Define the detailed project plan
- Implement the Competency Assessment training plan
- Organizational design and change management planning

**Design and Architecture Phase Deliverables**

- System Architecture Document
- Technical Design Document
- Initial Product Configuration
- Detailed Project Schedule

**Phase 3: Development Phase**

The objective of the Development Phase is to configure the application and build the components of the system based on the design. VPS Implementation Services and the End User Training Services offering can be utilized during this phase in conjunction with specialized offerings if required.

**Typical Roles of the Development Phase**

| Roles | Design & Architecture Phase Responsibilities |
|---|---|
| **Technical Lead** | Oversees and participates in application development. Maps development efforts to requirements and design, and coordinates unit testing processes. |
| **Developer** | Development of portions of the proposed solutions. This includes custom modules, integration to external systems, etc. |
| **Documentation and Training Developer** | Develops end-user training and documentation. |

## Development Phase Activities

- Application configuration and development:

  - Configuration of client-specific content types, classification taxonomies, workflows, sites and channels

  - Configuration of portal modules, groups, navigation hierarchy and pages

  - Establishing branding, templates and other functional elements specific to the customer's framework

  - Configuration and use of the out-of-the-box portal modules

  - Implementation of product extensions

- End-user documentation and training development

- Content migration

## Development Phase Deliverables

- Developed and Configured Application

- End-User Documentation and Training

## Phase 4: Deployment Phase

The objective of the Deployment Phase is to install the deployment environment, train the end users, migrate existing content and test the application prior to a successful launch.

Service offerings supporting the objectives of this phase include System Installation and Configuration, Content Migration, and a Deployment Readiness Review.

## Deployment Phase Activities

- Production system installation and configuration

- Test Planning

- System and functional testing

- Systems integration testing of interaction with external systems

- Performance testing and tuning

## Typical Roles of the Deployment Phase

| Roles | Deployment Phase Responsibilities |
|---|---|
| Technical Lead | Oversees testing and bug fixing processes. |
| Developer | Performs system testing and fixes issues identified in test results. Installs Vignette components. |
| Client Quality Assurance | Performs functional testing and documents test results. |
| Client System Administrator | Installs and configures all non-Vignette components specified in the system architecture – database, Web server, application server. |
| Performance Engineer | Creates, runs and analyzes performance requirements. Identifies bottlenecks and performance improvement recommendations for the complete solution. |
| Client Change Management Coordinator | Coordinates all tasks associated with transitioning to a new organizational structure or processes. |

- Implementation of change management plans

- Deployment readiness review

- Application launch

## Deployment Phase Deliverables

- Application Launch

- Project Completion Report

## Operate and Extend

Once the initial deployment is complete, enhancements to the existing application, rollout of additional sites and portals on the deployed system, and integration of additional content sources can be implemented. Development of these enhancements and extensions will follow the tasks in the main VSM phases, although the tasks and deliverables in the subsequent stages would be tailored to the scope of the product deliverables planned for the new release.

Activities in the operation of the application after launch include:

• Maintenance of the site components, such as the database and servers

• Monitoring and tuning of site performance

• Analysis of site measurements and reporting to determine areas for enhancement

• Providing a mechanism for end-user feedback and problem reporting

• Establishing a change management process for implementing enhancements and upgrades.

## Summary

Vignette Solutions Methodology is part of an integrated family of ECM products. With these products, Vignette's customers increase their productivity, reduce their costs, manage their risk, and improve their interactions with key constituents.

For more information about Vignette's Enterprise Content Management solutions, and their demonstrated value to over 1,700 organizations worldwide, visit www.vignette.com or call +1 888.608.9900.



**Vignette North America**
**Corporate Headquarters**
1301 S. MoPac Expressway
Suite 100
Austin, TX 78746
512.741.4300 Tel
512.741.1403 Fax
888.608.9900 Toll-Free
usinfo@vignette.com

**Vignette EMEA**
**Regional Headquarters**
99 King Street
Maidenhead
Berkshire SL6 1DP
United Kingdom
+44 (0) 1628.77.2000 Tel
+44 (0) 1628.77.2266 Fax
euroinfo@vignette.com

**Vignette Latin America**
**Vignette do Brasil**
55.11.3443.6908 Tel
55.11.3443.6961 Fax
lainfo@vignette.com
**Vignette de México**
+52.55.5091.4343 Tel
+52.55.5091.4310 Fax
mxinfo@vignette.com

**Vignette Asia-Pacific**
**Regional Headquarters**
ABN 65 003 176 850, Level 1
116 Miller Street
North Sydney NSW 2060
Australia
61.2.9455.5000 Tel
61.2.9455.5200 Fax
asiapacinfo@vignette.com

**WP0906_SolutionsMethodology** Publication Date: September 2006. Vignette does not warrant, guarantee, or make representations concerning the contents of this document. All information is provided "AS-IS," without express or implied warranties of any kind including, without limitation, the warranties of merchantability, fitness for a particular purpose, quality and title. Any information provided by Vignette customers or partners was obtained after the implementation of Vignette software and may have changed as of the Publication Date. You may not achieve the same results or benefits from using Vignette as described in this document. Nothing in this document is considered to be part of any product documentation or specification for any purpose. Features and functionalities of Vignette software may be licensed in one or more separately priced software programs or modules. Vignette reserves the right to change the contents of this document and the features or functionalities of its products and services at any time without obligation to notify anyone of such changes. Copyright 2006 Vignette Corporation. All rights reserved. Vignette, the V Logo, efficiency and efficiency experts are trademarks or registered trademarks of Vignette Corporation in the United States and other countries. All other company, product and service names, and brands are the trademarks or registered trademarks of their respective owners.



White Paper
September 2006

# Vignette® Content Management Blueprint



# Table of Contents

Introduction .................................................2

Scope of the Blueprint ..............................3

Business Analysis ....................................4

Define Business Goals ...............................4

Define Target Audiences ............................4

Create a Content Inventory .........................4

Define Goals for Personalization and Globalization .....4

Content Analysis ....................................4

Analyze Content Types ..............................4

Identify Content Contributors .....................4

Define Content Sources ..............................4

Develop a Content Classification Taxonomy .................5

Workflow and Interface Design ...................5

Define Groups and Roles ..........................5

Design Workflow .....................................5

Design Content Management Application Interface ......5

Design Content Targeting ..........................5

Implementation Design ..............................5

Design CMA Implementation ......................5

Design Database .....................................5

Design Content Integration ........................6

Develop Change Management Strategy ......................6

Conclusion ............................................6

# Introduction

Content management is the cornerstone of e-Business applications. It provides the foundation for internal editorial processes and for applications designed to achieve value from content-rich applications.

"The emergence of content-rich applications has had a number of profound affects on the nature of Web sites. The volume of information presented through a site has grown exponentially, creating new challenges in moving it from author to user. The…content has become increasingly diverse, as static text has been enhanced with graphics, pictures, and streaming audio and video to add interest and ease navigation. And finally, the most effective applications…use application logic to match the user with content specific to his or her needs and interests." — Yankee Group, Internet Computing Strategies Report, May 2001.

For more than ten years, Vignette has shown organizations worldwide how to transform their content from a liability to an asset. Vignette's software and expertise help these organizations harness the power of the records, documents, Web pages, images, multimedia and other unstructured content to create new opportunities, expand profits, and realize greater savings and efficiencies.

With this in mind, Vignette has developed the Content Management Blueprint, a practical how-to primer, to help you successfully implement your content management applications and effectively manage your electronic assets. An extension of the Vignette Solutions Methodology, the Blueprint gives you detailed information on the key components of a content management solution: content types, content taxonomies, workflow design, content management interface design, and content administration. Through best practices developed from more than 2000 customer implementations, the Blueprint helps you achieve the benefits of leveraging your content across multiple touch points and creating a scalable content management application.

## Scope of the Blueprint

The Blueprint addresses the development of the CMA, or content management application, portion of the site, which provides the internal processes for creating, editing, and administrating the Web site and its content. The CMA assembles the content assets, characterizes their delivery context, such as the site or the audience, adds metadata and categorization tags as a mechanism to maintain, track and retrieve content, provides an intuitive interface for user to enter content, and makes sure the content is deployed in the right combination and format. Using content management, you can dynamically associate your content with one or many delivery endpoints. This dynamic association of content to presentation allows you to change the content as needed, deliver specific content to your users based on their interests and traits, and to use your content assets in many sites and applications. You can also change the presentation aspects of a site without causing changes to the content itself. Content can be created or pulled from any source, managed, produced, and delivered without regard to the particulars of the devices and software used for presentation to the end user.

If content and presentation are tightly linked, a simple change in the branding, fonts, or colors used on a site could necessitate changes to all the content on the site, which might include thousands of pages.

The major blueprint components are:

• Business Analysis

• Content Analysis

• Workflow and Interface Design

• Implementation Design.

The flow diagram shows each of these areas, and their individual activities. These activities will be described in the following sections.



Figure 1 Content Management Blueprint Process

# Business Analysis

## Define Business Goals

Defining your business goals is the starting point – the content management application must enable your vision and strategy for the delivery of rich content to your end users. For example, if your business goal is to provide your customers with personalized information about your products and services, the content management application will be the key to delivering that content with quality, efficiency, and consistency.

## Define Target Audiences

The next activity in the Business Analysis area is defining your target audiences. For an employee portal application, your target audience may be your employees, but within that audience there are several groups that are interested in different types of information and content, such as Sales and IT.

Identifying their content needs will help you refine your business goals, and ensure that you can deliver the right content to the right people.

## Create a Content Inventory

Once you have identified the content needed to support your goals, create a content inventory, which lists the content, the goal or goals it supports, and if and where the content exists in the organization. The content inventory will be used to identify your content types in the next stage of the Blueprint, and can also be used to audit your existing content. The Blueprint contains a content inventory worksheet.

## Define Goals for Personalization and Globalization

Once you have identified your target audiences, you are ready to think about your goals for globalization and personalization. If you plan to deploy your site globally, this activity should include development of a globalization strategy. If you plan to deliver personalized content to specific target audiences, define a strategy and goals for the use of personalization techniques.

The outputs of the Business Analysis activity area are business goals, target audiences, and the content inventory.

# Content Analysis

## Analyze Content Types

The next activity involves analyzing the content that will be displayed on your site. Content types represent logical collections of content that must be managed by the application. For example, the content type product information may include a product description, part number, image, price, datasheet, and so on. The content types you identify form the building blocks of the content entry interface, the workflow, and the data model. The Blueprint includes a guideline on identifying content types.

## Identify Content Contributors

The next activity is Identify Content Contributors. The Blueprint helps you identify the business units and departments, and the groups within those units that produce or own content. Develop use cases, which are descriptions of the content production processes, for each group of content contributors.

The use cases should include steps for creating, updating, and deleting or archiving the content.

## Define Content Sources

In many cases, valuable content is locked inside Enterprise systems and other data sources. You need to ensure you can easily leverage this content in your Web applications – whether it is structured content from a system like ERP and CRM, or unstructured content that may come from some other internal or external Web site. In the analysis of this content, define the methods for obtaining the content, either through integration with other systems, or through content aggregation, and any requirements you have for moving data from an old system to the new one.

### Develop a Content Classification Taxonomy

A content taxonomy is a logical and hierarchical structure of categories that describe the content you have identified. The content taxonomy will be used to categorize your content, and it should contain categories that correspond to your business domain and the types of content your application will display. Creating a taxonomy and categorizing content provides benefits in the areas of content organization and retrieval, effective searches, focusing content development in necessary areas, and reuse of the content. The Blueprint includes a taxonomy guideline, and two detailed white papers on taxonomy design. The outputs of the content analysis activities are content types and sources, content contributors, and content classification taxonomy.

## Workflow and Interface Design

### Define Groups and Roles

The next component is Workflow and Interface Design. In designing workflow, you start by analyzing the current business processes involved in producing content, and determine if the processes can be optimized or combined. For each unique workflow, define groups that consist of people who do similar tasks, define roles that determine what functions the group can perform, such as creating content and editing content, and assign those roles to the groups you have identified.

### Design Workflow

There are many considerations in designing workflow, such as how editorial content and transactional content will be handled, local vs. global workflows, and the integration of existing business processes. The basic components of workflow design are the tasks to be performed, the decision points or branches that occur during the workflow, and the states that the content must progress through before being published on your site. The Blueprint includes a workflow guideline, and a detailed white paper on workflow design.

### Design Content Management Application Interface

Creating a useful content management interface for the Content Management Application users is important, since they will be using the application on a regular basis as an integral part of their work. A user and task analysis, followed by the creation of a prototype and usability testing will help ensure that the design fits the users' needs. CMA users need to be able to create new content, find and edit existing content, respond to workflow tasks, and assign categories and metadata to content.

### Design Content Targeting

Content Targeting Design involves defining the methods you will use to personalize content for your target audiences, which can include using taxonomy categories to deliver specific types of content. If you plan to use Web or e-mail campaigns, define the segments for the campaigns, the rules that will govern how the campaign operates, and the channels through which it will be delivered. The Blueprint includes a guideline on campaign design. The outputs of the Workflow and Interface Design area are groups, roles, and workflow design, CMA interface design, and methods for content targeting.

## Implementation Design

### Design CMA Implementation

The last area in the Blueprint is Implementation Design, which includes designing the publishing strategy for new content, staging of content across multiple environments or sites, versioning of content, and managing the users and groups who will have access to the Content Management Application.

### Design Database

The database will be used to store information about the content, and some of the content. The database design should encompass content taxonomy categories and their relationships, as well as both the content and functional relationships between content types.

**Design Content Integration**

If some of your content will come from external systems or sites, you will need to design methods for integrating or migrating it.

**Develop Change Management Strategy**

Developing a Change Management Strategy includes planning training for your CMA users and planning migration of your content from any existing sites. The Blueprint includes a guideline on end user training. You also need to consider how you will make use of measurements and reporting to determine if your business goals are being met, and to fine tune your site and its content once your site is up and running.

The outputs of the Implementation Design activities include implementation and database design, content integration and migration methods, and a change management plan. Now you are ready to successfully implement your content management application!

## Conclusion

This has been an introduction to Vignette's Content Management Blueprint. The Blueprint is a practical approach to help you successfully develop and deploy your content management application, and effectively manage your electronic assets. For more information about the Blueprint and VPS service offerings that help you with the activities in the Blueprint, please visit www. vignette.com/velocity.



**Vignette North America**
**Corporate Headquarters**
1301 S. MoPac Expressway
Suite 100
Austin, TX 78746
512.741.4300 Tel
512.741.1403 Fax
888.608.9900 Toll-Free
usinfo@vignette.com

**Vignette EMEA**
**Regional Headquarters**
99 King Street
Maidenhead
Berkshire SL6 1DP
United Kingdom
+44 (0) 1628.77.2000 Tel
+44 (0) 1628.77.2266 Fax
euroinfo@vignette.com

**Vignette Latin America**
**Vignette do Brasil**
55.11.3443.6908 Tel
55.11.3443.6961 Fax
lainfo@vignette.com
**Vignette de México**
+52.55.5091.4343 Tel
+52.55.5091.4310 Fax
mxinfo@vignette.com

**Vignette Asia-Pacific**
**Regional Headquarters**
ABN 65 003 176 850, Level 1
116 Miller Street
North Sydney NSW 2060
Australia
61.2.9455.5000 Tel
61.2.9455.5200 Fax
asiapacinfo@vignette.com

WP0906_CM_Blueprint Publication Date: September 2006. Vignette does not warrant, guarantee, or make representations concerning the contents of this document. All information is provided "AS-IS," without express or implied warranties of any kind including, without limitation, the warranties of merchantability, fitness for a particular purpose, quality and title. Any information provided by Vignette customers or partners was obtained after the implementation of Vignette software and may have changed as of the Publication Date. You may not achieve the same results or benefits from using Vignette as described in this document. Nothing in this document is considered to be part of any product documentation or specification for any purpose. Features and functionalities of Vignette software may be licensed in one or more separately priced software programs or modules. Vignette reserves the right to change the contents of this document and the features or functionalities of its products and services at any time without obligation to notify anyone of such changes.
Copyright 2006 Vignette Corporation. All rights reserved. Vignette, the V Logo, e.fficiency and e.fficiency experts are trademarks or registered trademarks of Vignette Corporation in the United States and other countries. All other company, product and service names, and brands are the trademarks or registered trademarks of their respective owners.



Country      Vignette Connect

SOLUTIONS      PRODUCTS      SERVICES      TRAINING      CUSTOMERS      ALLIANCES      ABOUT VIGNETTE      EVENTS & WEE

**Services**

Support

Consulting

**Custom Implementation Services**

Partner Services

# Custom Implementation Services

Customers can leverage the extensive implementation expertise of Vignette Consulting Services to ensure seamless integration of Vignette solutions with their existing infrastructure and third-party products.

### Industry-Leading Expertise

Customers draw upon a wide range of consulting services-all based on the best practices, methodologies and tools developed from Vignette's experience with over 2,000 customer implementations. Implementation services include:

- Project plan and scope evaluation
- System architecture review
- Application design and development
- Testing
- Deployment
- Technical project management

### A Wide Range of Service Offerings

These prepackaged service offerings are designed to help enterprises plan, build, and support effective and flexible content management solutions.

**Partner Services**—By combining Vignette products with other industry-leading solutions, Partner Services offers an efficient process for delivering "best in class" solutions.

In addition, Vignette can contribute many other services to meet customer needs including training with **Education Services in our Training Section**, certification and customer care services.

Print Version

Services / Consulting / **Custom Implementation Services** /

Site Map     Contact Us     Careers     Legal     Privacy